IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| HARRIS & JAMES, LLP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | |
| BRANCH BANKING AND | ) | FILE NO.:  5:11-CV-33 |
| TRUST COMPANY, CB | ) | |
| RICHARD ELLIS, INC. and CB | ) | |
| RICHARD ELLIS REAL ESTATE | ) | |
| SERVICES, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## NOTICE OF REMOVAL TO THE
## UNITED STATES DISTRICT COURT

COME NOW, Branch Banking and Trust Company ("BB&T"), CB Richard

Ellis, Inc. ("CBRE") and CB Richard Ellis Real Estate Services, LLC ("CBRE

Real Estate"), Defendants herein, and hereby file this Notice of Removal, showing

this Honorable Court the following:

1.

The above-styled civil action was commenced in the State Court of Bibb

County, Georgia on December 15, 2010, as Civil Action File No. 77485, and is

now pending therein.

2.

Plaintiff's Complaint and Summons, along with Plaintiff's First Request for Production of Documents and Plaintiff's First Interrogatories, were served on CBRE, through its registered agent, CT Corporation, on January 3, 2011.

3.

Plaintiff's Complaint and Summons, along with Plaintiff's First Request for Production of Documents and Plaintiff's First Interrogatories, were served on CBRE Real Estate, through its registered agent, CT Corporation, on January 3, 2011.

4.

Plaintiff's Complaint and Summons, along with Plaintiff's First Request for Production of Documents and Plaintiff's First Interrogatories were served on BB&T, through its registered agent, CT Corporation, on January 3, 2011.

5.

This Notice of Removal is timely filed within thirty (30) days of such service in accordance with the provisions of 28 U.S.C. §§ 1441 and 1446.

6.

Plaintiff is a Georgia limited liability partnership organized and existing under the laws of the State of Georgia with offices located in Bibb County,

Georgia. Plaintiff's partners (John Burke Harris, III, Joan Elizabeth West Harris, William C. Harris, and Sarah Stevenson Harris) are all citizens of the State of Georgia who reside within the Middle District of Georgia, Macon Division.

7.

CBRE is a corporation organized and existing under the laws of the State of Delaware, maintaining its principal office and principal place of business in Los Angeles, California.

8.

CBRE Real Estate is a limited liability company organized and existing under the laws of the State of Delaware, maintaining its principal office and principal place of business in Los Angeles, California. CBRE Real Estate's sole member is Insignia Financial Group, LLC, a limited liability company organized and existing under the laws of the State of Delaware, maintaining its principal office and principal place of business in Los Angeles, California. Insignia Financial Group, LLC's sole member is CB Richard Ellis, Inc., a corporation organized and existing under the laws of the State of Delaware, maintaining its principal office and principal place of business in Los Angeles, California.

9.

BB&T is a corporation organized and existing under the laws of the State of North Carolina, maintaining its principal office and principal place of business in Winston-Salem, North Carolina.

10.

In this action, Plaintiff seeks to recover actual and punitive damages, plus attorney's fees, from Defendants for the alleged destruction of Plaintiff's personal property. Plaintiff also seeks to recover damages, plus attorney's fees, from BB&T for the alleged breach of an agreement entitled "Lease Agreement" dated February 7, 2003, by and between Plaintiff and BB&T.

11.

Therefore, this action is one over which this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, in that (a) Plaintiff and Defendants are citizens of different states and (b) the amount in controversy has a value, exclusive of interests and costs, of $75,000.

12.

All Defendants join and consent to the removal of this case, as evidenced by the signature of their counsel below.

13.

Venue is proper in this Court pursuant to 28 U.S.C. § 90(b)(2) because it is "the district court of the United States for the district and division within which such action is pending." See U.S.C. § 1446(a).

14.

Pursuant to U.S.C. § 1446(d), a copy of this Notice of Removal is being served on Plaintiff, and a copy is being filed with the Clerk of the State Court of Bibb County, State of Georgia.

15.

In accordance with 25 U.S.C. § 1446(a), attached hereto and made a part hereof by reference are true and correct copies of the following documents filed in the State Court of Bibb County:

Exhibit 1 – The original Complaint filed by Plaintiff, with exhibits attached, together with the Summons;

Exhibit 2 – Plaintiff's First Request for Production of Documents to Defendants Branch Banking and Trust Company, CB Richard Ellis, Inc. and CB Richard Ellis Real Estate Services, LLC;

Exhibit 3 - Plaintiff's First Interrogatories to Defendants Branch Banking and Trust Company, CB Richard Ellis, Inc. and CB Richard Ellis Real Estate

Services, LLC; and

Exhibit 4 – The Notice of Removal.

WHEREFORE, Defendants CBRE and CBRE Real Estate respectfully pray that the State Court of Bibb County, State of Georgia, proceed no further with Civil Action File No. 77485 entitled <u>Harris & James, LLP v. Branch Banking and Trust Company, CB Richard Ellis, Inc. and CB Richard Ellis Real Estate Services, LLC,</u> and that said action be removed from the State Court of Bibb County, State of Georgia, to the United States District Court for the Middle District of Georgia, Macon Division.

Respectfully submitted, this 2<u>nd</u> day of <u>February</u>, 2011.

<div style="margin-left:40%">

s/ James M. Sherman, Esq.
_____
Georgia Bar No. 644716

Attorney for Defendants
Branch Banking and Trust Company,
CB Richard Ellis, Inc. and
CB Richard Ellis Real Estate Services, LLC

</div>

RAY & SHERMAN, LLC
One Securities Centre
3490 Piedmont Road, Suite 700
Atlanta, Georgia 30305
Telephone:  (404) 892-3600
Facsimile:   (404) 892-0445
E-mail:  jsherman@rayandsherman.com

# EXHIBIT 1

SUMMONS                          SC-85-1                          Clyde Castleberry Co., Covington, GA. 30015

# IN THE ~~SUPERIOR~~/STATE COURT OF ___BIBB___ COUNTY

## STATE OF GEORGIA

Harris & James, LLP

CIVIL ACTION
NUMBER ___77485___

_____ **PLAINTIFF**

VS.

Branch Banking and Trust Company,

CB Richard Ellis, Inc. and

CB Richard Ellis Real Estate Services, LLC
                    **DEFENDANT**

## SUMMONS

TO THE ABOVE NAMED DEFENDANT:

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is: **William C. Harris**
    **John Burke Harris, III**
    **P.O. Box 4866**
    **Macon, GA 31208-4866**

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This 15 day of December , 20 10 .

                    Clerk of ~~Superior~~/State Court

                    _Lillian Hawke_
                    BY
                                        Deputy Clerk

INSTRUCTIONS: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.

```
EXHIBIT
    1
```

IN THE STATE COURT OF BIBB COUNTY
STATE OF GEORGIA

RECEIVED
STATE COURT OF
BIBB COUNTY GEORGIA

2010 DEC 15 1 P 3: 56

CLERK STATE COURT

HARRIS & JAMES, LLP, :
  Plaintiff :
   :
v. : **Civil Action No.**
 : **77485**
BRANCH BANKING AND TRUST :
COMPANY, CB RICHARD ELLIS, INC.:
AND CB RICHARD ELLIS REAL :
ESTATE SERVICES, LLC, :
  Defendants :

## COMPLAINT FOR DAMAGES

  COMES NOW HARRIS & JAMES, LLP, Plaintiff herein, and shows to the Court the following:

1.

  Plaintiff is a limited liability partnership engaged in the practice of law, with offices located in Bibb County, Georgia.

2.

  Defendant Branch Banking and Trust Company (hereinafter "BB&T") is a corporation having offices in Bibb County, Georgia and carrying on business in Bibb County, Georgia, and is subject to the jurisdiction of this Court.

3.

  Defendant CB Richard Ellis, Inc. is a foreign corporation actively engaged in the transaction of business in the State of Georgia, and is subject to the jurisdiction of this Court. Defendant CB Richard Ellis Real Estate Services, LLC is a foreign limited liability company actively engaged in the transaction of business in the State of Georgia, and is subject to the jurisdiction of this Court.

4.

Defendant BB&T is the owner of an office building located at 201 Second Street, Macon, Bibb County, Georgia, which office building is sometimes known as BB&T, Macon Tower (hereinafter referred to as "BB&T Tower").

5.

Pursuant to a written Lease Agreement dated February 7, 2003 and a subsequent letter agreement dated March 31, 2006, Plaintiff leased from Defendant BB&T a locked storage room located on the third floor of BB&T Tower having an area of approximately 320 square feet. The monthly rental for the storage room was $150.00 which Plaintiff paid to BB&T until August 2007 when Plaintiff received written notice from BB&T to discontinue such rental payments. Attached as Exhibit 1 is the Lease Agreement dated February 7, 2003, and attached as Exhibit 1A is the March 31, 2006, letter referenced herein.

6.

At all times during the lease of said storage room, Plaintiff was current in its rental payments to Defendant BB&T and was not in default under the terms of the Lease Agreement.

7.

Plaintiff stored client files, business records and other personal property belonging to Plaintiff and to two of Plaintiff's partners in the locked storage room.

8.

On information and belief, BB&T hired Defendant CB Richard Ellis, Inc. and/or Defendant CB Richard Ellis Real Estate Services, LLC (hereinafter collectively "CBRE") to serve as building manager of BB&T Tower, and Defendant CBRE was serving as building manager during December 2006 and January 2007.

9.

At some time during late December 2006 or early January 2007, Defendant CBRE, acting by and through one of its employees, entered the locked storage room under lease to Plaintiff, removed Plaintiff's property from the storage room, and had Plaintiff's property destroyed.

10.

The destruction of Plaintiff's personal property by Defendant CBRE constituted a trespass for which Plaintiff is entitled to recover damages in an amount to be determined by a jury.

11.

The destruction of Plaintiff's personal property was done with the knowledge and consent of Defendant BB&T, for which BB&T is jointly liable with Defendant CBRE to Plaintiff for damages for the destruction of Plaintiff's personal property.

12.

The destruction of Plaintiff's personal property by Defendant CBRE with the knowledge and consent of Defendant BB&T was done without notice to Plaintiff and without affording Plaintiff an opportunity to remove its property from its storage room. The destruction of Plaintiff's property without notice to Plaintiff evidenced an entire lack

of care on the part of Defendants which raises the presumption of conscious indifference by Defendants to the consequences of their actions, for which Defendants are jointly liable for punitive damages in an amount not to exceed $250,000.00.

13.

In consenting to the removal and the destruction of Plaintiff's property located in Plaintiff's leased storage room, Defendant BB&T violated the covenant of quiet enjoyment contained in its written Lease Agreement with Plaintiff, for which Defendant BB&T is liable to Plaintiff for damages for breach of the Lease Agreement, and is further liable to Plaintiff for Plaintiff's attorneys fees in bringing this action to recover for said breach.

WHEREFORE, Plaintiff prays as follows:

(a) That process issue in terms of law requiring the Defendants to be and appear to answer this Complaint as required by law;

(b) That Defendants be served in the manner prescribed by law;

(c) That Plaintiff be awarded damages from Defendants for the destruction of Plaintiff's personal property in an amount to be determined by a jury;

(d) That Plaintiff be awarded punitive damages from Defendants in an amount not to exceed $250,000.00 as prescribed by O.C.G.A. §51-12-5.1;

(e) That Plaintiff have recovery from Defendant BB&T for damages resulting from Defendant's breach of its Lease Agreement with Plaintiff, in an amount to be determined by a jury.

(f) That Plaintiff recover its attorneys fees and costs for bringing this action; and

(g) That Plaintiff have such other and further relief as is proper.

A jury trial is demanded.

Respectfully submitted this 15th day of December, 2010.

William C. Harris
State Bar No. 331667
John Burke Harris, III
State Bar No. 330510

Attorneys for Plaintiff,
Harris & James, LLP

Post Office Box 4866
Macon, Georgia 31208-4866
(478) 745-9661

THIS LEASE AGREEMENT (the "Lease") is made and entered into as of the 7th day of February, 2003 between BRANCH BANKING AND TRUST, which owns a facility known as 201 Second Street, Macon, GA 31202, (hereinafter called "Landlord"), and Harris & James, whose address for purposes hereof is 201 Second Street, Suite #600, Macon, Georgia 31202, (hereinafter called "Tenant").

Subject to and upon the terms, provisions and conditions hereinafter set forth, and each in consideration of the duties, covenants and obligations of the other hereunder, Landlord and Tenant hereby agree as follows:

PREMISES

1.      (a) Landlord does hereby lease, demise and let to Tenant and Tenant does hereby lease and take from Landlord those certain premises (hereinafter sometimes called the "Premises" or "Leased Premises") as more particularly described on the floor plan attached hereto as Exhibit B) in the building known as BB&T, Macon Tower located at 201 Second Street in the City of Macon, Georgia, County, Bibb, located on the real property as more particularly described on attached Exhibit A, each initialed for identification by both parties (which building and the real property on which it is located is hereinafter sometimes collectively referred to as the "Building").

(b)     The term "net rentable area," as used herein, shall refer to: (i) in the case of a single tenancy floor, all floor area measured from the inside surface of the outer glass or finished column wall of the Building to the inside surface of the opposite outer wall excluding only the service areas ("Service Areas") within the outside walls used for building stairs, fire towers, elevator shafts, flues, vents, stacks, pipe shafts and vertical ducts, but including any such Service Areas which are for the specific use of the particular Tenant such as special stairs or elevators plus an allocation of the square footage of the Building's elevator mechanical rooms and ground floor and basement lobbies (if applicable), and (ii) in the case of a floor to be occupied by more than one Tenant, all floor areas within the inside surface of the outer glass or finished column walls enclosing the Leased Premises and measured to the mid-point of the walls separating areas leased by or held for lease to other Tenants or from areas devoted to corridors, stairwells, elevator foyers, rest rooms, mechanical rooms, janitor closets, vending areas and other similar facilities for the use of all Tenants on the particular floor (hereinafter sometimes called "Common Areas"), but including a proportionate part of the Common Areas located on such floor based upon the ratio which the Tenant's net rentable area (excluding Common Areas) on such floor bears to the aggregate net rentable area (excluding Common Areas) on such floor plus an allocation of the square footage of the Building's elevator mechanical rooms and ground floor and basement lobbies (if applicable). No deductions from net rentable area shall be made for columns or projections necessary to the Building. The net rentable area in the Leased Premises has been calculated on the basis of the foregoing definition and is hereby stipulated for all purposes hereof to be 4,607 square feet, whether the same should be more or less as a result of minor variations resulting from actual construction and completion of the Leased Premises for occupancy so long as such work is done substantially in accordance with the terms and provisions hereof. Tenant agrees that, except as expressly stated herein, no representations or warranties with respect to the condition of the Premises and no promises to decorate, alter, repair or improve the Premises have been made by Landlord, and Tenant agrees to accept the Premises in an "AS IS WHERE IS" condition as tendered by Landlord.

TERM

2.      (a) Subject to and upon the terms and conditions set forth herein, or in any exhibit hereto, this Lease shall continue in force for a term of thirty six (36) months ("Term") beginning on the first (1st) day of February, 2003 (the "Commencement Date"), and ending on the 31st day of January, 2006 (the "Termination Date").

(b) In the event the Leased Premises should not be ready for occupancy by the Commencement Date for any reason, Landlord shall not be liable or responsible for any claims, damages or liabilities in connection therewith or by reason thereof, and the Term of this Lease shall commence at the time that the Leased Premises are ready for occupancy by Tenant. Should the Term of this Lease commence on a date other than that specified in Paragraph 2 (a) above, Landlord and Tenant will, at the request of either, execute a declaration specifying the beginning date of the Term of this Lease. In such event, rental under this Lease shall not commence until that time (herein "Revised Commencement Date"), and the Term in this Lease shall thereupon commence and the expiration date shall be extended so as to give effect to the full stated Term.

AUTHORIZED USE

3.      The Leased Premises are to be used and occupied by Tenant solely for the purpose of office space to conduct the business of an attorney's office and for no other purpose.

BASE RENTAL

4. Tenant hereby agrees to pay a base annual rental (herein called "Base Rental") in accordance with the following schedule:

| Year | Annual Rental | Monthly Rental |
|------|---------------|----------------|
| 1 | $59,107.81 | $4,925.65 |
| 2 | $60,305.63 | $5,025.47 |
| 3 | $61,549.52 | $5,129.13 |

The Tenant shall also pay, as additional rent, all such other sums of money as shall become due from and payable by Tenant to Landlord under this Lease. The Landlord shall have the same remedies for default for the payment of additional rent as are available to Landlord in the case of a default in the payment of Base Rental (the Base Rental and additional rent sometimes

interest at the maximum rate per annum permitted by law (the "Default Rate") until paid.

BASE RENTAL ADJUSTMENT FOLLOWING BASE YEAR

5. Beginning with the second calendar year following the Base Expense Year, as hereinafter defined, Tenant shall pay annually to Landlord its proportionate share of an increase, if any, in real estate taxes and its proportionate share of an increase, if any, in operating expenses hereinafter together referred to as "expenses" for calendar years subsequent to the Base Expense Year over such expenses for the Base Expense Year. In addition, beginning with the second calendar year following the Base Expense Year, the rental payable for each calendar year of the term hereof shall be increased or decreased by Tenant's proportionate share of an increase or decrease, if any, in expenses for calendar years subsequent to the Base Expense Year over such expenses for the Base Expense Year. The amount payable annually by Tenant and the increase or decrease, if any, in the annual rental shall be determined by a comparison of expenses incurred by the Landlord in the preceding year with expenses incurred in the Base Expense Year.

Landlord shall with reasonable promptness after the expiration of the Base Expense Year furnish the Tenant with a statement in writing, signed by the Landlord, setting forth in reasonable detail the expenses for the Base Expense Year and after the expiration of each subsequent calendar year furnish the Tenant with a comparative statement setting forth in reasonable detail the expenses for the subsequent calendar year. The comparative statement shall contain a statement of the amount payable by Tenant to Landlord based thereon, which amount shall be equal to Tenant's proportionate share of the increase, if any, in expenses incurred by the Landlord during the previous calendar year, and shall also contain the amount of the increase in Tenant's rent for the then current calendar year, or the amount of decrease to be credited against Tenant's rent. The amount payable by Tenant to Landlord shall be paid within thirty (30) days after receipt of such statement.

Until such time as there shall have been furnished to the Tenant the comparative statement setting forth the expenses for the previous calendar year, the Tenant shall be responsible for payment of monthly installments of rent equal to the installment payable for the 12th month .of the preceding calendar year. Upon receipt of the comparative statement, the Tenant's monthly installments of rent for the then current calendar year shall be increased or decreased by adding thereto or subtracting therefore the quotient obtained by dividing the amount of the increase or decrease in the annual rental by the number of monthly installments thereafter becoming due within the calendar year. Notwithstanding the provisions for decreases in annual rental set forth in this paragraph, it is hereby expressly provided and agreed that in no event shall the annual rental be decreased below the original annual rental specified in Paragraph 4 hereof.

At the expiration of the last calendar year of the term of this lease, Landlord shall furnish to Tenant a comparative statement as described above. The Tenant's obligation for the payment to the Landlord of the increase in expenses, if any, for the last calendar year of the lease term over those expenses for the previous calendar year shall not be obviated by the termination of this lease according to its terms or the vacation of the premises by Tenant, and the amount payable shall be paid within thirty (30) days after receipt of such statement.

If this lease shall terminate on a day other than the last day of a calendar year, the amount of increase or decrease, if any, in annual rental payable by the Tenant applicable to the calendar year in which such termination shall occur shall be prorated on the basis which the number of days from the commencement of said calendar year to and including such termination date bears to 365.

Tenant shall have the right to inspect and examine at reasonable times the Landlord's books of account and records pertaining to the expenses for the Base Expense Year and the expenses for any subsequent calendar year and at its expense to make abstracts from such books of account and records.

As used in this article the words and terms, which follow, are defined as:

(a.) "Tenant's Proportionate Share" shall be a fraction whose denominator is the rentable square foot area of the building, which is agreed to be 130,056 square feet and whose numerator shall be the net rentable square foot area of the demised premises which is agreed to be 4,607 square feet.

(b.) "Real Estate Tax" shall be the property taxes and assessments imposed upon the building and the land upon which it stands, but such terms shall not include tax increases which result from additions or improvements made by Landlord, or any other Tenant.

(c.) "Operating Expenses" shall include all direct costs of administration, operation and maintenance of the building, paved areas and grounds, as determined in accordance with generally accepted accounting practices, incurred or paid on behalf of the Landlord, and shall include the following by way of illustration but not limitation: premiums for all kinds of insurance carried by the Landlord, except insurance against loss of rents, the cost of labor, materials and services for the operation and maintenance of the building, paved areas and grounds, including, but not limited to, water and sewage charges, garbage and waste disposal, licenses, permits and inspection fees, heat, lights, power and other utilities, air conditioning and ventilation, normal repairs, elevator and escalator service, plumbing service, janitorial and cleaning maintenance contracts, watchmen, guards and personnel engaged in administration, operation and maintenance of the building, paved areas, and grounds, together with payroll taxes and employee benefits applicable thereto, depreciation of personal property used in the maintenance of the building, paved areas and grounds, and supplies, materials, tools, equipment and general costs. "Operating Expenses" shall not include:

(1.) The cost of painting, repainting, decorating and redecorating for any occupants in the building.
(2.) Any administrative wages and salaries, management fees, renting commissions or legal and advertising expenses.

(3.) The cost of any unusual or extraordinary work or service or of any work or service not normally

(d.) "Base Expense Year" for operating expenses shall be the first full calendar year of the term of the lease during which at least 50% of the Building is occupied.

(e.) "Base Expense Year" for real estate taxes shall be the 12-month period constituting the base tax year which shall be the first full real estate tax year occurring during the lease term for which the building and improvements to be constructed, of which the demised premises form a part, have been fully assessed for Real Estate Tax purposes as completed improvements. If the building of which the demised premises form a part are existing improvements, the Base Expense Year shall be the 12 month period constituting the first lease year which shall be the Calendar Year 2003.

## SECURITY DEPOSIT

6. Tenant shall within ten (10) days of the execution of this Lease by Landlord deposit a security deposit (the "Security Deposit") in the amount of N/A with Landlord to secure Tenant's performance of its Lease obligations. If Tenant defaults Landlord may, without prejudice to Landlord's other remedies, apply part or all of the Security Deposit to cure Tenant's default. If Landlord so uses part or all of the Security Deposit, then Tenant shall within ten (10) days after written demand, pay Landlord the amount needed to restore the Security Deposit to its original amount. Any part of the Security Deposit not used by the Landlord as permitted by this Lease shall be returned to Tenant after the Termination Date. If Landlord sells the Building then the Landlord shall transfer the balance of the Security Deposit to the new owner and shall be relieved of any liability for the Security Deposit. Tenant shall not be entitled to any interest on the Security Deposit, and Landlord may commingle the same with other monies of Landlord.

## SERVICES TO BE FURNISHED BY LANDLORD

7. Landlord covenants and agrees with Tenant:

(a) To use reasonable efforts to cause public utilities to furnish the electricity, gas and water utilized in operating any and all facilities serving the Leased Premises.

(b) To furnish (as part of the Basic Costs of the Building) Tenant while occupying the Premises:

(i) Hot and cold water and sewer service at those points of supply provided for general use of other Tenants and in such amounts as are determined by Landlord to be standard, but not including water and sewer required for operation of Tenant's non-standard equipment (such as additional nonstandard air conditioning equipment), which shall be furnished only upon the request of Tenant, who shall bear the entire cost thereof.

(ii) Central heat and air conditioning in season, at such temperatures and in such amounts as are considered by Landlord to be standard [being from Monday through Friday, 8:00 am to 6:00 pm, and Saturday 8:00 am to 12:00 pm (the "Building Standard Hours")], but such service at all other times will be furnished only upon the reasonable request of Tenant, who shall bear the entire cost thereof.

(iii) Routine maintenance and electric lighting service for all public areas and special service areas of the Building in the manner and to the extent deemed by Landlord to be standard (from Monday through Friday, 8:00 am to 6:00 pm, and Saturday 8:00 am to 12:00 pm), but such service at all other times will be furnished only upon the reasonable request of Tenant, who shall bear the entire cost thereof.

(iv) Janitor service on a five (5) day week basis at no extra charge; provided, however, if Tenant's floor covering or other improvements is other than building standard, Tenant shall pay the additional cleaning cost attributable thereto as additional rent. Tenant shall pay said additional rent upon presentation of a statement therefor by Landlord, and Tenant's failure to pay shall constitute an Event of Default hereunder.

(v) All building standard fluorescent bulb replacement in all Common Areas, Tenant areas and all incandescent bulb replacement in public areas, toilet and rest room areas and stairwells.

(c) To furnish Tenant two (2) keys for each corridor door entering the Leased Premises. Additional keys will be furnished at a charge by Landlord on an order signed by Tenant or Tenant's authorized representative. All such keys shall remain the property of Landlord. No additional locks shall be allowed on any door of the Leased Premises without Landlord's written permission, and Tenant shall not make, or permit to be made, any duplicate keys, except those furnished by Landlord. Upon termination of this Lease, Tenant shall surrender to Landlord all keys of the Leased Premises, and give to Landlord the explanation of the combination of all locks for safes, safe cabinets and vault doors, if any, in the Leased Premises.

(d) To provide and install, at Landlord's cost, a building standard Tenant identification hall sign and lobby identification for the Leased Premises. Any changes to Tenant identification signage during the term or any extension of this lease shall be at Tenant's cost.

(e) Landlord is not required to provide generator power to Tenant at any time or for any reason. Tenant hereby expressly acknowledges that said generator power may be available to Landlord in any space it occupies in the Building (the cost thereof being at the sole expense of Landlord).

Notwithstanding subparagraphs (a) through (e) above, Landlord reserves the right, without any liability to Tenant and without affecting Tenant's covenants and obligations hereunder (provided Landlord gives reasonable prior notice to Tenant, except in the case of an emergency), to stop service of the HVAC, electric, sanitary, elevator (if any), or other systems serving the Premises, or to stop any other services required by Landlord under this Lease, whenever and for so long as may be necessary by reason of (i) accidents, emergencies, strikes, or the making of repairs or changes which Landlord in good faith deems necessary or (ii) any other cause beyond Landlord's reasonable control. Further, it is also understood and agreed that Landlord

8.  (a) All installations now or hereafter placed on the Leased Premises in excess of building standard items as determined by Landlord shall be for Tenant's account and at Tenant's cost (and Tenant shall pay ad valorem taxes and increased insurance thereon), which cost shall be payable by Tenant to Landlord as additional rent hereunder promptly upon being invoiced therefor. Failure by Tenant to pay said additional rent in full within thirty (30) days shall constitute an Event of Default (as hereinafter defined) by Tenant hereunder, giving rise to all remedies available to Landlord under this Lease and at law for nonpayment of rent.

(b) Tenant and Landlord agree that the improvements, if any, set forth in Paragraph 6 of Special Stipulations attached as Exhibit D hereto ("Tenant Improvements") shall be completed in accordance with the terms and conditions set forth in Paragraph 6 of Special Stipulations. Any and all such Tenant Improvements shall be fully described in the plans and specifications set forth in Paragraph 6 of Special Stipulations, which plans and specifications shall require the prior written approval of Landlord, which approval may be withheld in Landlord's sole and absolute discretion. The plans and specifications shall include, if requested by Landlord, a calculation of Tenant's fully connected electrical design load with and without demand factors and shall indicate the number of watts of un-metered and sub-metered loads. Tenant acknowledges that the Tenant Improvements will be designed and constructed by independent architects, engineers and contractors. Accordingly, Landlord does not guarantee or warrant that such Tenant Improvements will be free from defects, and Landlord shall have no liability therefor. In the event of any defects, Landlord shall assign any warranties to Tenant. Funding for Tenant Improvements shall be provided in accordance with the provisions of Paragraph 6 of Special Stipulations.

## QUIET ENJOYMENT

9.  Tenant shall, and may peacefully have, hold and enjoy the Leased Premises, subject to the other terms hereof, provided that Tenant pays the rent and other sums herein recited to be paid by Tenant, and performs all of Tenant's covenants and agreements herein contained. It is understood and agreed that this covenant and any and all other covenants of Landlord contained in the Lease shall be binding upon Landlord and its successors only with respect to breaches occurring during its and their respective ownership of the Landlord's interest hereunder.

## LIMITATION OF LANDLORD'S PERSONAL LIABILITY

10.  Tenant specifically agrees to look solely to Landlord's interest in the Building for the recovery of any judgment from Landlord, it being agreed that Landlord shall never be personally liable for any such judgment. The provision contained in the foregoing sentence is not intended to, and shall not, limit any right that Tenant might otherwise have to obtain injunctive relief against Landlord or Landlord's successors in interest, or any other action not involving the personal liability of Landlord to respond in monetary damages from assets other than Landlord's interest in the Building, or any suit or action in connection with enforcement or collection of amounts which may become owing or payable under or on account of insurance maintained by Landlord.

## PARKING

11.  While Tenant is occupying the Premises and is not in default under the terms of this Lease, Tenant shall have the right in common with other Tenants to use the number of parking spaces in the Building's or another parking lot indicated on attached Exhibit C, subject to rules and regulations promulgated from time to time by Landlord. Tenant shall be entitled to use only that number of spaces allocated on Exhibit C. Nothing herein contained shall be construed to grant to Tenant any estate in real property nor the exclusive right to a particular parking space, but rather as a license only. At such time and under such circumstances as Landlord deems appropriate, Landlord may rearrange assigned parking spaces or may eliminate assigned spaces altogether and may provide attendant parking or such other system or management of parking as it deems necessary or desirable. Upon Landlord's request, Tenant shall provide Landlord with a list of automobile license numbers assigned to cars used by Tenant's employees and shall thereafter notify Landlord within five (5) days of any change in such information.

## PAYMENTS BY TENANT

12.  Tenant covenants and agrees with Landlord to pay all rent and sums provided to be paid to Landlord under this Lease at the times and in the manner herein provided.

## REPAIRS BY LANDLORD

13.  Tenant hereby accepts the Premises in their present condition and acknowledges that no representation or warranty as to the condition of the Premises has been made to it. Tenant covenants and agrees with Landlord that unless otherwise stipulated herein, Landlord shall not be required to make any improvements to or repairs of any kind or character on the Leased Premises during the term of this Lease, except such repairs as may be deemed necessary by Landlord for normal maintenance operations. The obligation of Landlord to maintain and repair the Leased Premises shall be limited to building standard items; provided, however, that the need for any such repairs is not caused by the fault or negligence of Tenant, its officers, agents, employees, or servants. Tenant agrees that it shall report immediately in writing to Landlord any defective condition in or about the Premises known to Tenant. Special leasehold improvements will, at Tenant's written request, be maintained by Landlord at Tenant's expense, at a cost or charge equal to the costs incurred in such maintenance, plus an additional charge to cover overhead.

## REPAIRS BY TENANT

14.  Tenant covenants and agrees with Landlord, at Tenant's own cost and expense, to repair or replace any damage or injury done to the Building, or any part thereof, caused by Tenant or Tenant's agents, employees, invitees or visitors; provided, however, if Tenant fails to make such repairs or replacement promptly, Landlord may, at its option, make repairs or replacements, and Tenant shall repay the cost thereof to the Landlord on demand, subject to the provisions of Paragraph 39.

## CARE OF LEASED PREMISES

Tenant covenants and agrees with Landlord that in the event Tenant should desire to assign this Lease or sublet the Leased Premises or any part thereof, Tenant shall give Landlord written notice of such desire at least sixty (60) days in advance of the date on which Tenant desires to make such assignment or sublease and naming the intended assignee or subTenant. In no event will Tenant attempt to assign the Lease or sublease the Premises or any portion thereof to any bank, financial services company, insurance company or similar entity which would be competitive with the businesses engaged in by BB&T or any of its subsidiaries or affiliates. Landlord shall then have a period of thirty (30) days following receipt of such notice within which to notify Tenant in writing that Landlord elects, in its sole and absolute discretion, one of the following: (1) to terminate this Lease as to the space so affected as of the date so specified by Tenant, in which event Tenant will be relieved of all further obligation hereunder as to such space, or (2) to permit Tenant to assign or sublet such space, subject, however, to subsequent written approval of the proposed assignee or subTenant by Landlord, or (3) to refuse to consent to Tenant's assignment or subleasing such space and to continue this Lease in full force and effect as to the entire Leased Premises. If Landlord should fail to notify Tenant in writing of such election within said thirty (30) day period, Landlord shall be deemed to have elected option (3) above. For purposes of this Lease, a merger between Tenant and another party or the transfer of substantially all of the assets of Tenant to another party shall constitute an assignment. No assignment or subletting by Tenant shall relieve Tenant of any obligation under this Lease. Any attempted assignment or sublease by Tenant in violation of the terms and covenants of this Paragraph 16 shall be void.

## SUBORDINATION; ESTOPPEL CERTIFICATES

17. Tenant covenants and agrees with Landlord that the rights and interests of Tenant under this Lease and in and to the Premises shall be subject and subordinate to first deeds of trust, mortgages, and other security instruments and to all renewals, modifications, consolidations, replacements and extensions thereof (the "Security Documents") heretofore or hereafter executed by Landlord covering the Premises, the Building and the land or any parts thereof, to the same extent as if the Security Documents had been executed, delivered and recorded prior to the execution of this Lease. After the delivery to Tenant of a notice from Landlord that it has entered into one or more Security Documents, then, during the term of such Security Documents, Tenant shall deliver to the holder or holders of all Security Documents a copy of all notices to Landlord and shall grant to such holder or holders the right to cure all defaults, if any, of Landlord hereunder within the same time period provided in this Lease for curing such defaults by Landlord and, except with the prior written consent of the holder or holders of the Security Documents, Tenant shall not surrender or terminate this Lease except pursuant to a right to terminate expressly set forth in this Lease. The provisions of this Paragraph shall be self-operative and shall not require further agreement by Tenant; however, at the request of Landlord, Tenant shall execute such further documents as may be required or requested to evidence and set forth for the benefit of the holder of any Security Documents the obligations of Tenant hereunder. At any time and from time to time upon not less than ten (10) days' prior notice by Landlord, Tenant shall execute, acknowledge and deliver to the Landlord a statement of the Tenant in writing certifying (i) the Rentable Area of the Premises, (ii) the Commencement Date and Termination Date of this Lease, (iii) the Base Rental and Base Rental Adjustment (additional rent as set forth in Paragraph 5 of this Lease), (iv) that this Lease is unmodified and in full force and effect, or if there have been modifications, that the same are in full force and effect as modified and stating the modifications, (v) whether or not the Landlord is in default in the keeping, observance or performance of any covenant, agreement, term, provision or condition contained in this Lease and, if so, specifying each such default, (vi) that Tenant has unconditionally accepted and occupied the Premises, (vii) that all requirements of the Lease have been complied with and no charges, set-offs or other credits exists against any rent, (viii) that Tenant has not assigned, pledged, sublet, or otherwise transferred any interest in this Lease, and (ix) such other matters as Landlord may reasonably request, it being intended that any such statement may be relied upon by any prospective purchaser, Tenant, mortgagee or assignee of any mortgage of the Building or of the Landlord's interest therein.

## ALTERATIONS, ADDITIONS, and IMPROVEMENTS

18. Tenant covenants and agrees with Landlord not to permit the Leased Premises to be used for any purpose other than that stated in Paragraph 3 hereof, or make or allow to be made any alterations or physical additions in or to the Leased Premises, or place signs on the Leased Premises which are visible from outside the Leased Premises, without first obtaining the written consent and approval of Landlord; however, said approval by Landlord does not constitute certification that Tenant alterations, additions, and improvements are in compliance with applicable laws, including, but not limited to, the Americans with Disabilities Act ("ADA),. Any and all such alterations, physical additions or improvements, when made to the Leased Premises by Tenant, shall at once become the property of Landlord and shall be surrendered to Landlord upon termination of this Lease by lapse of time or otherwise without payment or compensation to Tenant; provided, however, this clause shall not apply to movable equipment or furniture owned by Tenant; and, provided further, however, that notwithstanding any other provision of this Lease, upon termination hereof Tenant shall promptly and in accordance with then applicable laws, regulations and reasonable requirements of Landlord, remove all of Tenant's freon or other permitted hazardous material containing equipment from the Leased Premises. Tenant agrees specifically that no food, soft drink or other vending machine will be installed within the Leased Premises without Landlord's prior written permission. Landlord may, at its option, at any time while this Lease is in force or within fifteen (15) days thereafter, notify Tenant in writing to restore the Premises in any respect to the same condition that they were in at the beginning of the Term of this Lease, whereupon Tenant shall be obligated to so restore the Premises before the expiration of this Lease or within a reasonable time after such notice is given, whichever is later.

## LEGAL USE AND VIOLATIONS OF INSURANCE COVERAGE

19. . Tenant covenants and agrees with Landlord not to occupy or use, or permit any portion of the Leased Premises to be occupied or used for any business or purpose which is unlawful, disreputable or deemed to be extra-hazardous on account of fire, or permit anything to be done which would in any way increase the rate of fire or liability or any other insurance coverage on said Building and/or its contents.

## LAWS AND REGULATIONS; RULES OF THE BUILDING

20. Tenant covenants and agrees with Landlord, for itself and its servants, to comply with all laws, ordinances, rules and regulations (state, federal, municipal and other agencies or bodies having any jurisdiction thereof) relating to the use,

21.     Tenant covenants and agrees with Landlord to permit Landlord or its agents or representatives to enter into and upon any part of the Leased Premises at all reasonable hours to inspect the same, clean or make repairs, alterations or additions thereto, and to permit Landlord to perform substantial renovation work in and for the Building or the mechanical systems serving the Building (which work may include, but not be limited to, the repair or replacement of the Building's exterior facade, exterior plaza, parking (garage or area), exterior window glass, elevators, electrical systems, air-conditioning and ventilating systems, pumping system, common hallways or lobby), all as Landlord may deem necessary or desirable, and Tenant shall not be entitled to any abatement or reduction of rent by reason thereof or otherwise have any cause of action against Landlord, and no eviction, actual or constructive, shall be deemed to occur. Upon entry as provided in this Paragraph 21, Landlord shall not be liable to Tenant in any manner whatsoever. Tenant hereby waives any claim or cause of action against Landlord for damages by reason of loss or interruption of Tenant's business and profits therefrom because of the prosecution of any such work or any part thereof; provided, however, that all such work will be performed in such a manner as to interfere as little as practicable with Tenant's use of the Premises.

## NUISANCE

22. Tenant covenants and agrees with Landlord to conduct its business and control its agents, employees, invitees and visitors in such manner as not to create any nuisance, or interfere with, annoy or disturb any other Tenant or Landlord in its operation of the Building.

## CONDEMNATION AND LOSS OR DAMAGE

23.     Landlord and Tenant mutually covenant and agree that if the Leased Premises shall be taken or condemned for any public purpose, or sold under threat of such exercise to the agency or instrumentality possessing such power, to such an extent as to render the Leased Premises unTenantable, this Lease shall, at the option of either party, forthwith cease and terminate. Tenant shall have no rights or claims to any part of any award made to or received by Landlord for such taking or to any part of the purchase price, if so sold under threat of exercise of the power of eminent domain, or against Landlord for the value of any unexpired term of this Lease.

## DAMAGES FROM CERTAIN CAUSES

24.     Landlord and Tenant mutually covenant and agree that Landlord shall not be liable or responsible to Tenant for any loss or damage to any property or person occasioned by theft, fire, act of God, public enemy, injunction, riot, vandalism, strike, insurrection, war, court order, requisition or order of governmental body or authority, or for any damage or inconvenience which may arise through repair or alteration of any part of the Building, or failure to make any such repairs.

## LANDLORD'S LIEN

25.     Landlord and Tenant mutually covenant and agree that in consideration of the mutual benefits arising under this Lease, Tenant hereby grants to Landlord a lien and security interest on all property of Tenant now or hereafter placed in or upon the Leased Premises, and such property shall be and remain subject to such lien and security interest of Landlord for payment of all rent and other sums agreed to be paid by Tenant herein. The provisions of this Paragraph 25 relating to said lien and security interest shall constitute a security agreement under the Uniform Commercial Code (the "Code") so that Landlord shall have and may enforce a security interest on all property of Tenant now or hereafter placed in or on the Leased Premises, including but not limited to all fixtures, machinery, equipment, furnishings and other articles of personal property now or hereafter placed in or upon the Leased Premises by Tenant. Tenant agrees to execute as debtor such financing statement or statements as Landlord may now or hereafter reasonably request in order that such security interest or interests may be protected pursuant to said Code. Landlord may at its election at any time file a copy of this Lease as a financing statement. Landlord, as secured party, shall be entitled to all of the rights and remedies afforded a secured party under said Code in addition to and cumulative of the Landlord's liens and rights provided by law or by the other terms and provisions of this Lease.

## LANDLORD'S RIGHT TO RELET

26.     Landlord and Tenant mutually covenant and agree that upon the occurrence of any Event of Default (as hereinafter defined) by Tenant in any of the terms or covenants of this Lease or in the event the Leased Premises are abandoned by Tenant, Landlord shall have the right, but not the obligation, to relet same for the remainder of the Term provided for herein, and if the rent received through reletting does not at least equal the rent provided for herein, Tenant shall pay and satisfy the deficiency between the amount of rent so provided for and that received through reletting, including, but not limited to, brokerage and real estate commission or fees and the cost of renovating, altering and decorating for a new occupant. Nothing herein shall be construed as in any way denying Landlord the right, in the event of abandonment of said Premises or other breach of this Lease by Tenant, to treat the same as an entire breach and at Landlord's option to terminate this Lease and/or immediately seek recovery for the entire breach of this Lease and any and all damages which Landlord suffers thereby.

## HOLDING OVER

27.     Landlord and Tenant mutually covenant and agree that in the event of holding over by Tenant after expiration or termination of this Lease without the written consent of Landlord, Tenant shall pay as liquidated damages double rent one hundred and twenty five percent (125%) of the monthly rental in affect at the expiration of this lease for the entire holdover period. No holding over by Tenant after the Term of this Lease shall be construed to extend the Lease. In the event of any unauthorized holding over, Tenant shall indemnify Landlord against all claims for damages by any other Tenant or Tenant to

shall immediately give notice thereof to Landlord. If the Leased Premises, through no fault or neglect of Tenant, its agents, employees, invitees or visitors, shall be partially destroyed by fire or other casualty so as to render the Premises unTenantable, the rent provided for herein shall abate thereafter until such time as the Leased Premises are made Tenantable as determined by Landlord in its sole and absolute discretion. In the event of the total destruction of the Leased Premises, without fault or neglect of Tenant, its agents, employees, invitees or visitors, or if from any cause the same shall be so damaged that Landlord shall decide not to rebuild, then all rent owed up to the time of such destruction or termination shall be paid by Tenant and thenceforth this Lease shall cease and come to an end.

## ATTORNEYS' FEES

29.     Landlord and Tenant mutually covenant and agree that in the event Tenant defaults in the performance of any of the terms, covenants, agreements or conditions contained in this Lease and Landlord places the enforcement of this Lease, or any part thereof, or the collection of any rent due, or to become due hereunder or recovery of the possession of the Leased Premises in the hands of an attorney, or files suit upon the same, Tenant agrees to pay Landlord's reasonable attorneys' fees of not less than 10% of the amount due to Landlord.

## ALTERATION OF LEASE

30.     Landlord and Tenant mutually covenant and agree that this Lease may not be altered, changed or amended, except by an instrument in writing signed by both parties hereto.

## ASSIGNMENT BY LANDLORD

31.     Landlord and Tenant mutually covenant and agree that Landlord shall have the right to transfer and assign, in whole or in part, all of its rights and obligations hereunder and in the Building and property referred to herein, and in such event and upon such transfer, any such transferee shall have the benefit of, and be subject to, the provisions of Paragraphs 9 and 10 of this Lease, and no further liability or obligation shall thereafter accrue against Landlord hereunder.

## LANDLORD'S FAILURE TO PERFORM

32.     Landlord and Tenant mutually covenant and agree that if Landlord fails to perform any of its obligations under this Lease, Landlord shall not be in default hereunder and Tenant shall not have any rights or remedies growing out of such failure unless Tenant gives Landlord written notice thereof setting forth in reasonable detail the nature and extent of such failure and such failure by Landlord is not cured within the thirty (30) day period following delivery of such notice or such longer period therefor provided elsewhere in this Lease. If such failure cannot reasonably be cured within such thirty (30) day period, the length of such period shall be extended for the period reasonably required therefor if Landlord commences curing such failure within such thirty (30) day period and continues the curing thereof with reasonable diligence and continuity.

## TENANT'S FAILURE TO PERFORM

33.     Landlord and Tenant mutually covenant and agree that if Tenant fails to perform any one or more of its obligations hereunder, in addition to the other rights of Landlord hereunder, Landlord shall have the right, but not the obligation, to perform all or any part of such obligations of Tenant. Upon receipt of a demand therefor from Landlord, Tenant shall reimburse Landlord for (i) the cost to Landlord of performing such obligations and a reasonable profit and overhead, plus (ii) interest thereon at a rate of twelve percent (12%) per annum (but in no event more than the maximum rate permitted by applicable law) from the date of demand. If the obligation so performed by Landlord involves any repair or maintenance or the removing by Landlord of any improvements to or use of the Premises not authorized by this Lease, such reasonable profit and overhead shall be twelve percent (12%) of the cost to Landlord of performing such obligation.

## EVENT OF DEFAULT

34.     "Event of Default" means the occurrence of any one or more of the following: (i) failure of Tenant to pay when due any rent or other amount required to be paid under this Lease; (ii) failure of Tenant, after fifteen (15) days written notice from Landlord of Tenant's default in the performance of any of Tenant's obligations, covenants or agreements (other than those pertaining to payment of rent) under this Lease, to do, observe, keep and perform with diligence and continuity any of such obligations, covenants, or agreements; (iii) the adjudication of Tenant to be bankrupt; (iv) the filing by Tenant of a voluntary petition in bankruptcy, receivership, or other related or similar proceedings; (v) the making by Tenant of a general assignment for the benefit of its creditors; (vi) the appointment of a receiver of Tenant's interests in the Premises in any action, suit or proceeding by or against Tenant's interest in the Premises or by or against Tenant; (vii) any other voluntary or involuntary proceedings instituted by or against Tenant under any bankruptcy or similar laws, unless the occurrence of any such involuntary receivership or proceeding is cured by the same being dismissed or stayed within sixty (60) days thereafter; (viii) the failure of Tenant to discharge any material judgment against Tenant within sixty (60) days after such judgment becomes final; (ix) the sale or attempted sale under execution or other legal process of the interest of Tenant in the Premises; (x) the death or incapacity of Tenant, if Tenant is an individual or sole proprietorship; (xi) failure to continue in occupancy or abandonment of the Premises for any period of time consisting of thirty (30) or more consecutive days; or (xii) if Tenant assigns, mortgages or encumbers this Lease or sulets the whole or any part of the Premises in violation of the terms of this Lease. Notwithstanding the notice and cure period provided above, Landlord shall not, with respect to any default hereunder, be required to provide such notice and cure period more than two (2) times during the Term, and upon a subsequent occurrence of any default hereunder Tenant shall not be entitled to a notice and cure period, but Landlord may, at its option, immediately declare an Event of Default and exercise its remedies as provided herein.

renting the Premises and, all unpaid rent through the date of such termination. If Landlord elects to terminate Tenant's right to possession of the Premises without terminating the Lease, Landlord may re-let the Premises or any portion of it for the account of Tenant to any person or persons for such rental and for such terms and other conditions as Landlord deems practical, and Tenant shall be liable to Landlord for the amount, if any, by which the total rent and all other payments herein provided for the unexpired balance of the Term exceed the net amount, if any, received by Landlord from such re-renting, being the gross amount so received by Landlord less the cost of repossession, re-renting, remodeling and other expenses relating thereto including, but not limited to, brokerage and real estate commissions and fees. Such sum or sums shall be immediately due and payable by Tenant upon demand. In no case shall Landlord have any obligation to, or be liable for failure to, re-rent the Premises or collect the rental due under such re-renting, and in no event shall Tenant be entitled to any excess rents received by Landlord. If Landlord elects to terminate Tenant's right to possession without terminating the Lease, Landlord shall have the right at any time thereafter to terminate this Lease, whereupon the foregoing provisions with respect to termination will thereafter apply. If an Event of Default occurs or in case of any holding over or possession by Tenant of the Premises after the expiration or termination of this Lease, Tenant shall reimburse Landlord on demand for all costs incurred by Landlord in connection therewith including, but not limited to, reasonable attorneys' fees, court costs and related costs associated with the collection of amounts due plus interest thereon at the Default Rate from the date such costs are paid by Landlord up to the maximum amount permitted under applicable state law. Actions by Landlord to collect amounts due from Tenant as provided in this Paragraph may be brought at any time, and from time to time, on one or more occasions, without the necessity of Landlord's waiting until the termination of this Lease. The remedies expressed herein are cumulative and not exclusive, and the election by Landlord to terminate Tenant's right to possession without terminating the Lease shall not deprive Landlord of the right, and Landlord shall have the continuing right, to terminate this Lease by notice to Tenant.

## NON-WAIVER

35. Failure of Landlord to declare any default immediately upon occurrence thereof, or delay in taking any action in connection therewith, shall not waive such default, but Landlord shall have the right to declare any such default at any time and take such action as might be lawful or authorized hereunder, either in law or in equity.

## CASUALTY INSURANCE

36. Landlord shall maintain property insurance on the Building, including additions and improvements by Tenant which are required to be made by Tenant by this Lease and which have become or are to become the property of the Landlord upon vacation of the Leased Premises by Tenant. Said insurance shall be maintained with an insurance company authorized to do business in the state where the Building is located, in amounts desired by Landlord, and at the expense of Landlord (subject to the provisions of Paragraph 5), and payments for losses thereunder shall be made solely to Landlord. Tenant shall maintain property insurance at its expense on all of its personal property, including removable trade fixtures located in the Leased Premises and on all additions and improvements made by Tenant and not required to be insured by Landlord above. The property insurance required by this Paragraph 36 is insurance for all risks (unless expressly excluded or limited) of direct physical loss against the perils covered by so-called "all risks" coverages or its equivalent as approved for use by the Department of Insurance or its successor in the state where the Building is located. If the annual premiums to be paid by Landlord shall exceed the standard rates because Tenant's operations, contents of the Leased Premises or improvements with respect to the Leased Premises beyond building standard result in any extra-hazardous exposure, Tenant shall promptly pay the excess amount of the premium upon request by Landlord.

## LIABILITY INSURANCE

37. Tenant and Landlord shall at their respective expense, maintain a policy or policies of commercial general liability insurance with the premiums thereon fully paid on or before due date, issued by and binding upon an insurance company acceptable to Landlord, such insurance to afford minimum protection of not less than $1,000,000.00 in respect of personal injury or death in respect of any one occurrence and of not less than $500,000.00 for property damage in any one occurrence. Landlord shall be named an additional insured under the policy held or obtained by Tenant.

## INDEMNITY; HOLD HARMLESS

38. Except for the claims, rights of recovery and causes of action waived in Paragraph 39, Tenant shall indemnify, defend and hold harmless Landlord and Landlord's agents, directors, officers, shareholders, partners, members, employees, invitees, and contractors, from any and all claims, losses, costs, damages, or expenses (including reasonable attorneys' fees) in connection with any injury to, including death of, any person or damage to any property arising, wholly or in part, out of any action, omission, or neglect of Tenant or Tenant's directors, officers, shareholders, partners, members, employees, agents, invitees, or guests, or any parties contracting with Tenant relating to the Premises; provided however, Tenant's indemnity shall not apply to the act, omission or neglect of any invitee or guest of Tenant outside of the Premises. If Landlord shall without fault on its part, be made a party to any action commenced by or against Tenant, the Tenant shall protect and hold Landlord harmless and shall pay all costs and expenses, including (but not limited to) reasonable attorneys' fees in connection therewith. Tenant's obligations under this Paragraph 38 shall not be limited by the amount or types of insurance maintained or required to be maintained by Tenant under this Lease. The obligations under this Paragraph 38 shall survive the expiration or earlier termination of this Lease.

recovery, and causes of action that either party or any party claiming by, through, or under such party by subrogation or otherwise may now or hereafter have against the other party or any of the other party's directors, officers, shareholders, partners, members, employees, or agents for any loss or damage that may occur to the Building, Premises, Tenant Improvements, or any of the contents of any of the foregoing by reason of fire, Act of God, the elements, or any other cause, excluding willful misconduct but including (without limitation) negligence of the parties hereto or their directors, officers, shareholders, partners, members, employees, or agents that was required to be insured against under the terms of this Lease. Landlord shall not be liable to Tenant for any inconvenience or loss to Tenant in connection with any of the repair, maintenance, damage, destruction, restoration, or replacement referred to in this Lease. Landlord shall not be liable to Tenant and Tenant hereby waives all claims against Landlord and its directors, officers, shareholders, partners, members, employees, or agents for any incidental or consequential damages, loss of profits, business interruption, acts of other Tenants, vandalism, loss of trade secrets or other confidential information, and any damage, loss or injury caused by a defect in the Premises or the Building, pipes, air conditioning, heating, plumbing or by water leakage of any kind from the roof, walls, windows or other portion of the Premises or the Building, or caused by electricity, gas, oil, fire or any other cause in, on, or about the Premises, the Building or any part thereof, unless caused solely by the gross negligence or willful misconduct of Landlord. The waivers in this Paragraph 39 shall survive the expiration or earlier termination of this Lease.

## REMOVAL OF TENANT'S PROPERTY

40. Tenant shall retain ownership of all movable equipment, furniture, and supplies placed in or on the Premises by Tenant and shall have the right to remove such movable equipment, furniture, and supplies prior to termination of this Lease provided that no Event of Default has been committed by Tenant which has not been fully cured in a manner acceptable to Landlord and further provided that Tenant repairs any injury to the Premises or the Building resulting from such removal. Unless Tenant has made prior arrangements with Landlord and Landlord has agreed in writing to permit Tenant to leave such equipment, furniture or supplies on the Premises for an agreed period, if Tenant does not remove such movable equipment, furniture and supplies prior to such termination, then, in addition to its other remedies at law or in equity, Landlord shall have the right to have such items removed and stored at Tenant's sole cost and expense and all damage to the Premises or Building resulting therefrom repaired at the cost of Tenant. All such movable equipment, furniture and supplies shall, at Landlord's option, be deemed abandoned and become the property of the Landlord, and Tenant shall not have any further right with respect thereto, or for reimbursement therefor.

## RELOCATION

41. (a) Landlord reserves the right to relocate the Premises to substantially comparable space within the Building. Landlord will give Tenant written notice of its intention to relocate the Premises, and Tenant will complete such relocation within sixty (60) days after receipt of such written notice. If Tenant does relocate within the Building, then effective on the date of such relocation this Lease will be amended by deleting the description of the original Premises and substituting for it a description of such comparable space. Landlord agrees to reimburse Tenant for its actual reasonable moving costs to such other space within the Building, the reasonable costs of reprinting stationery, and the costs of rewiring the new Premises for telephone and computers comparably to the original Premises. If Tenant does not want to relocate within the Building, Tenant may, at its option upon written notice to Landlord within ten (10) days after receipt from Landlord of notice to relocate, terminate this Lease, whereupon Landlord shall reimburse Tenant for actual and reasonable out of pocket costs (but no other costs, consequential or otherwise) directly related to Tenant's relocation out of the Building.

(b) Landlord shall have the right at any time to change the arrangement and/or location of entrance and passageways, doors and doorways, corridors, elevators, stairs, toilets, parking facilities, or any other common facilities in the Building or on the Premises, all without the same constituting an actual or constructive eviction and without incurring any liability therefor; provided, however, that such changes shall be made in a manner having no material adverse affect on Tenant's access to the Premises.

## BROKERAGE FEES

42. Tenant warrants and represents that it has had no dealings with any broker in connection with the negotiations or execution of this Lease and Landlord will not be responsible for, and Tenant will indemnify, defend and hold Landlord harmless against, any brokerage commission, leasing commission or finder's fee claimed by any other party in connection with this Lease.

## SUCCESSORS AND ASSIGNS

43. This Lease shall be binding upon and inure to the benefit of Landlord, its successors and assigns, and shall be binding upon and inure to the benefit of Tenant and, to the extent assignment may be approved by Landlord hereunder, Tenant's assigns.

## FORCE MAJEURE

44. Landlord shall be excused for the period of any delay and shall not be deemed in default with respect to the performance of any terms, covenants or conditions of this Lease when prevented from so doing by a cause or causes beyond Landlord's control, including (but not limited to) labor disputes, government regulations or controls, fire or casualty, inability to obtain any materials or services, or acts of God.

## SEVERABILITY

46. No oral statements or prior written material not specifically incorporated herein shall be of any force or effect. Tenant agrees that in entering into and taking this Lease it relies solely upon the representations and agreements contained in this Lease and no others. This Lease, including the exhibits which are attached hereto and a part hereof for all purposes, constitutes the whole agreement of the parties and shall in no way be conditioned, modified or supplemented except by a written agreement executed by, and delivered to, both parties.

## SURRENDER OF PREMISES

47. On the last day of the Term, or upon the earlier termination of this Lease, Tenant shall peaceably and quietly surrender the Premises to Landlord, broom clean, in its present order, repair and condition equal to the condition when delivered to Tenant, excepting only reasonable wear and tear resulting from normal use and damage by fire or other casualty. Prior to the surrender of the Premises to Landlord, Tenant, at its sole cost and expense, shall remove all liens and other encumbrances which may have resulted from the acts or omissions of Tenant. If Tenant fails to do any of the foregoing, Landlord, in addition to other remedies available to it at law or in equity, may, without notice, enter upon, reenter, possess and repossess itself thereof, by force, summary proceedings, ejectment, or otherwise, and may dispossess and remove Tenant and all persons and property from the Premises; and Tenant waives any and all damages or claims for damages as a result thereof. Such dispossession and removal of Tenant shall not constitute a waiver by Landlord of any claims by Landlord against Tenant.

## LIGHT AND AIR

48. There is no easement, expressed or implied, for light or air to or for the benefit of Tenant. Neither diminution nor shutting off of light or air or both nor any other effect on the Premises by any structure erected or condition now or hereafter existing on lands adjacent to the Building shall affect this Lease, abate rent, or otherwise impose any liability on Landlord.

## REGULATORY COMPLIANCE

49. Landlord will be responsible for the cost of compliance with the ADA and other regulatory requirements in the Common Areas, and will hold Tenant harmless therefrom. Tenant will be responsible for the cost of compliance with the ADA and other regulatory requirements within the Premises, except with respect to the Common Areas, if any, located within the Premises, and will hold Landlord harmless therefrom. Should Tenant make any permitted alterations, additions or improvements in accordance with Paragraph 18, Tenant shall be responsible for compliance with the ADA and other regulatory requirements with respect to said improvements.

## SMOKING

50. No smoking is permitted at any time in the Common Areas of the Building "Smoking" is defined as inhaling or exhaling any lighted cigarette, cigar, pipe or similar product or device, including (but not limited to) any smokeless tobacco product. Smoking is permitted only in designated areas outside the Building.

## NOTICES

51. Any notices or other communication required or permitted hereunder shall be sufficiently given if personally delivered or sent by certified or registered mail, return receipt requested postage paid, addressed as follows:

Tenant:

To:      Mr. Bill Harris
         Harris & James
         201 Second Street, Suite #600
         Macon, GA 31202

Landlord:

To:      Branch Banking and Trust Company
         2400 Reynolda Road
         Winston-Salem, NC 27106
         Attention: Rental Income Administrator

Copies (which shall not constitute notice) to:

or such other addresses as shall be furnished in writing by either party to the other party. Any such notice or communication shall be deemed to have been given as of the date so mailed. Refusal to accept delivery shall constitute receipt.

voluntary or other surrender of this Lease by Tenant or a mutual cancellation thereof, shall not work a merger, and shall, at the option of Landlord, terminate all or any existing subleases or subtenancies, or may, at the option of Landlord, operate as an assignment to it of Tenant's interest in any or all such subleases or subtenancies.

## GOVERNING LAW

53.     This Lease shall be interpreted and construed in accordance with the laws of the State where the Building is located.

## TIME IS OF THE ESSENCE

54.     Time is of the essence with respect to each and every obligation of Tenant under this Lease.

## HEADINGS

55.     The headings set forth in the margin of this Lease are for convenience only and shall be disregarded in construing the terms hereof.

## SIGNAGE

56.     Tenant shall not install any signage on or within the Building or the exterior of the Premises without the prior written consent of Landlord, which consent may be withheld in Landlord's sole and absolute discretion.

## RECORDATION

57.     There shall be no recordation of this Lease or any memorandum thereof without the prior written consent of Landlord, which consent may be withheld in Landlord's sole and absolute discretion.

## SPECIAL STIPULATIONS

58.     Special Stipulations, if any, are attached hereto as **Exhibit D**, and shall constitute additional terms of this Lease.

IN TESTIMONY WHEREOF, the parties hereto have executed this Lease as of the date aforesaid all pursuant to authority duly granted.

LANDLORD:                                    TENANT:

BRANCH BANKING AND TRUST COMPANY             HARRIS AND JAMES

By: _____               By: _____

Its: _____                Its: _____Partner_____
          (Title)                                      (Title)


WITNESSES (as to Landlord):                  WITNESSES (as to Tenant):

_____                    _____

_____                    _____


STATE OF _North Carolina - Forsyth_ COUNTY

I, a Notary Public of the County and State aforesaid, certify that _William D Andre_ personally appeared before me this day and acknowledged that (s)he is the _Vice President_ _____ of BRANCH BANKING AND TRUST COMPANY, a _North Carolina_ corporation, and that, as _Such_ , being authorized to do so, executed the foregoing instrument on behalf of the corporation. Witness my hand and official stamp or seal, this _10_ day of _March_ ,2003.

(Stamp/Seal)
_____
          Notary Public

OFFICIAL SEAL
Notary Public, North Carolina
COUNTY OF FORSYTH
HOLLY ANNE ADAMS
My Commission Expires January 26, 2005

My Commission expires: _Jan. 26, 2005_


STATE OF _Georgia - Bibb_ COUNTY

I, a Notary Public of the County and State aforesaid, certify that _John Burke Harris II_ personally appeared before me this day and acknowledged that (s)he is authorized to execute the foregoing instrument on his behalf. Witness my hand and official stamp or seal, this _4th_ day of _March_ ,2003.

(Stamp/Seal)
_____
          Notary Public

My Commission expires: _2/8/07_

## EXHIBIT A

### LEGAL DESCRIPTION

All that parcel of land in the City of Macon, Bibb County, Georgia composed of all Lots 7 and 8 in Square 20 of said City and a 17.-5-foot of encroachment into Walnut Street adjacent thereto, and being more particularly described as follows: Beginning at the point where the northwest line of Second Street is intersected by the present southwest line of Walnut Street and running thence northwest along Walnut Street 208.5 feet to the 10-foot public alley which runs through Square 20 from Walnut Street to Mulberry Street; thence southwest along said public alley 226.0 feet to the 20-foot public alley which runs through said Square 20 from Second Street to First Street; thence southeast along said 20-foot public alley 208.5 feet to the northwest line of Second Street; and thence northeast along Second Street 226.0 feet to the point of beginning.

EXHIBIT B

FLOOR PLAN OF PREMISES



While this lease or any extension hereof is in effect, Tenant shall have the right to lease up to <u>ten (10)</u> parking spaces in the parking garage in the building at market rate. Tenant also may lease additional parking spaces, if available in Landlord's parking lot located on the corner of Second and Walnut Street's. Said spaces can be leased on a month-to-month basis at the market rate.

Tenant acknowledges that parking rates are subject to change during this lease or any extension. Tenant will be notified in writing 30 days in advance by Landlord or Landlord's designee of any rate change.

In the event any of the terms and conditions of this Exhibit D conflict or are inconsistent with the terms and conditions of the Lease to which this Exhibit D is attached, the terms and conditions of this Exhibit D shall control.

1. Broker and Broker's Compensation: Owner agrees to pay Fickling & Company, Inc. on the first day of the term and subsequent occupancy, a rental commission equal to a cash out of 4% of the aggregate base rental amount. Owner also agrees and acknowledges that Broker may co-op with outside brokers on the leasing of the building. Should any leasing involve a co-broker relationship then the commission shall be 6% of the aggregate base rental amount which said commission shall be shared equally with the outside Broker. On renewals and options to renew, negotiated by broker, owner agrees to pay Broker on the first day of the renewal term a rental commission equal to a cash out of 4% of the aggregate base rental amount.

   In the event Owner negotiates a new lease with a new Tenant for vacant space in the building, then Broker's compensation described above herein shall be 2% of the aggregate base rental amounts. For the prupose of this lease in which most terms and conditions have been agreed upon between Owner and Tenant or the negotiated lease could not be consummated without the buisness relationship of the Owner and Tenant. The Broker will be responsible for finalizing open items and preparing the lease. To avoid confusion, Landlord and Broker shall register prospects that they are working in writing by letter, e-mail, or fax.

2. Landlord hereby agrees to provide Tenant with a tenant improvement allowance of one thousand five hundred dollars ($1,500.00) which shall be paid by rent abatement, pending proof of work by Tenant and approved by Landlord. Any tenant improvements over said $1,500.00 shall be at the sole cost of the Tenant.

3. During the term of this lease, Tenant hereby agrees to lease approximately 320 square feet of storage space located on the third floor of the BB&T Tower. Said rent for the storage area shall be one hundred and fifty dollars ($150.00) per month or one thousand eight hundred dollars ($1,800.00) annually.

1. No person shall loiter in the entrances, corridors, sidewalks, entry passageways, halls, stairways, or elevators, or in any way obstruct the same, and same shall be used only as passageways and means of passage to and from the Premises.

2. No bicycles, vehicles, or animals of any kind shall be brought into the building or kept in or about the Premises.

3. The windows, glass doors, and lights that reflect or admit light into the halls or other portions of the building or of the Premises shall not be covered or obstructed. The toilets or urinals shall not be used for any purposes other than those for which they were constructed, and no rubbish, newspapers, or other substance of any kind shall be thrown into them. Waste and excessive or unusual use of water shall not be allowed.

4. Except to the extent necessary to hang a reasonable number of pictures and charts, no person shall drive nails, screws, or drill into the walls, ceilings, partitions, floors or fixtures, in or upon the Premises. The Premises shall not be painted unless the color of paint and time of painting is first approved by Landlords, which approval shall not be unreasonably withheld.

5. No sign, picture, advertisement, or notice of any kind shall be displayed on any part of the Premises or the building unless the same is first approved by Landlords. No curtains, blinds, shades, or screens shall be attached to or hung in, or used in connection with, any window or door of the Premises or of the building without the prior written consent of Landlord. Without limiting the generality of the foregoing, Landlord shall have the right to approve or disapprove the quality, type, design, color, shape, or manner of installation of any item for which approval is required by this paragraph, and shall have full right to disapprove without reason any blind, screen, sign, picture, advertisement or notice which will be visible from outside the Premises.

6. The use of electrical current shall never exceed the capacity of existing feeders, risers, or wiring installation. No additional electrical wiring shall be done without first obtaining the consent of Landlord; and any such additional wiring shall be done by Landlord's electrician or under his supervision, and Tenant shall bear the entire expense of such additional materials, labor, and installation, including the time and labor of Landlord's electrician. Nothing shall be done in or about the Premises or said building, that might increase the rate of insurance on said building, its contents, or its property, or obstruct or interfere with the rights of other occupants or annoy them in any way, including, but not limited to, using any musical instrument, making loud or unseemly noises or singing, or using the Premises for sleeping, lodging, or cooking by any person at any time except with Landlord's permission. Tenant shall be permitted to use for its own employees within its premises a conventional coffee-maker, and refrigerator, and with Landlord's written permission an oven and range provided that no cooking shall in any event be done that annoys the other occupants or Landlord by objectionable odors or otherwise. No vending machines of any kind will be installed, permitted or used on any part of the Premises, without the express written permission of Landlord. No part of said building shall be used for gambling, immoral, or other unlawful purposes. No area outside of the Premises shall be used for storage purposes at any time.

7. No additional lock, latch or bolt of any kind shall be placed upon any door or any changes be made in existing locks or mechanism thereof without prior written consent of Landlord. At the termination of this lease, Tenant shall return to Landlord all keys furnished to Tenant by Landlord, or otherwise procured by Tenant, and in the event of loss of any keys so furnished Tenant shall pay to Landlord the cost thereof.

8. Landlord shall have the right to prescribe the weight, position, and amount of installation of heavy articles such as safes, machines and other equipment which Tenant may use in the Premises. No safes, furniture, boxes, large parcels, or other kind of freight shall be taken to or from the Premises or allowed in any elevator, hall or corridor at any time except by permission of and at times allowed by Landlord. Tenant shall make prior arrangements with Landlord's building superintendent for use of elevators for the purpose or transporting such articles and such articles may be taken in or out of said building only between or during such hours as may be arranged with and designated by said superintendent. Persons employed to move the same must be approved by Landlord. In no event shall any weight be placed upon such floor by Tenant so as to exceed 50 pounds per square foot of floor space without the prior written approval of Landlord, and in no event shall the load placed on the floor exceed the maximum weight bearing load for which the floor was designated by the architect.

9. No unusual or objectionable odors shall be produced upon or permeate from the Premises and no unusual vibrations shall be produced upon or emanate from the Premises; and no inflammable, combustible, or explosive fluid, chemical, or substance shall be brought into or stored in said building.

10. No substances of any kind shall be thrown out of the windows or doors, nor down the passages of the building.

11. The building shall be opened to occupants, their servants, agents, employees, and invitees between the hours of 8:00 A.M. and 8:00 P.M. on all days except Saturdays and Sundays and Holidays, and on Saturdays between the hours of 8:00 A.M. and 12:00 P.M. At all other times every person, including, but not limited to, Tenant, its employees, servants, agents and invitees, entering or leaving said building may be questioned by a guard as to such person's business therein and shall be required to sign such person's name on a form provided by Landlord for registering such persons. Landlord shall not be liable for excluding any person from said buidling during such other times or for admission of any person to said building at any time, or for damages or loss or theft resulting therefrom to any person including Tenant.

12. Tenant shall not employ any person other than Landlord's employees for the purpose of cleaning or taking care of the Premises, without first obtaining the written permission of Landlord.

13. Landlord reserve the right, from time to time, to make reasonable amendments to any one or more of the above rules and regulations and to make such other reasonable rules and regulations as may be needed or proper from time to time for the safety, care, and cleanliness of the Premises and the building and for the preservation of good order therein.



Branch Banking & Trust Co.

Support Services Group

2825 Reynolda Road (27108)
P.O. Box 1220
Winston-Salem, NC 27102-1220

March 27, 2006

Mr. Burke Harris
Harris & James, LLP
VIA FACSIMILE: 478-745-9824

RE:    201 Second Street, Suite 600
       Macon, GA

Dear Mr. Harris:

In response to your request to leave behind or store some items in the above referenced
suite after expiration of the lease effective March 31, 2006, BB&T proposes the
following:

- All items must be moved into one area, internal space, not an external office with
  windows. This way when we show the space to prospective tenants it is neat and
  in order. **This must be done by March 31, 2006.**
- Broom clean and repair the suite in accordance with the terms of your lease
  agreement.
- All items are completely removed by April 30, 2006 or sooner if we find a tenant
  to occupy the space. In that case, a one week notice will be given.
- An additional $100 to be sent with the April storage rent payment in the amount
  of $150 for a total of $250.00 due on or before April 1, 2006.
- You may continue on a month to month with the storage facility located on the 3rd
  floor (as described on the lease agreement by and between BB&T and Harris and
  James, dated February 7, 2003), but will agree to remove all items and turn the
  space back over to BB&T upon 30 days from written notice. Monthly rental for
  that will remain at $150.00.

Once the first requirement above is met, BB&T's local facilities person, Wayne Cralley,
will arrange to walk the space with you. Please make yourself or someone on your behalf
available to him.



EXHIBIT

1A

Page Two
March 27, 2006

I trust this is acceptable and ask that you acknowledge same by signing below and returning to my attention. BB&T has enjoyed having as its tenant and wishes you the best with all of your future endeavors. Please feel free to contact me if you have any questions.

Sincerely,

Tina M. Gruber
Banking Officer
Support Services, Real Estate

Acknowledged and Accepted this _31st_ day of _March_, 2006

By: _Brooke Harris_

# EXHIBIT 2

IN THE STATE COURT OF BIBB COUNTY
STATE OF GEORGIA

RECEIVED
STATE COURT OF
BIBB COUNTY GEORGIA

2010 DEC 15 1 P 3: 37

CLERK STATE COURT

HARRIS & JAMES, LLP,
    Plaintiff

v.

BRANCH BANKING AND TRUST
COMPANY, CB RICHARD ELLIS, INC.
AND CB RICHARD ELLIS REAL
ESTATE SERVICES, LLC,
    Defendants

Civil Action No.
77485

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS BRANCH BANKING AND TRUST COMPANY, CB RICHARD ELLIS, INC. AND CB RICHARD ELLIS REAL ESTATE SERVICES, LLC

COMES NOW HARRIS & JAMES, LLP, Plaintiff, and requires that Defendants, **Branch Banking and Trust Company, CB Richard Ellis, Inc. and CB Richard Ellis Real Estate Services, LLC,** produce the documents hereinafter described and permit Plaintiff and its attorneys to inspect them and copy such of them as they may desire.

Production is requested on the forty-fifth day following service of this request at the law offices of Harris & James, LLP, 3573 Vineville Avenue, Macon, Georgia, 31204, or at such other time and place as may be agreed upon by counsel of record.

Any reference to **"You"** or **"Your"** is intended to mean Defendants **Branch Banking and Trust Company, CB Richard Ellis, Inc. and CB Richard Ellis Real Estate Services, LLC.**

As used in this document request, the term **"document"** or **"documents"** shall include any written or graphic matter including but not limited to, correspondence, memoranda, notes, messages, letters, facsimile and e-mails, in whatever form, including but not limited to hard copy and digital form.

Any reference to **"storage room"** is the storage area leased by Harris & James, LLP pursuant to a written Lease Agreement dated February 7, 2003, and subsequent Letter

**EXHIBIT**
2

Agreement dated March 31, 2006, and which is identified in Paragraph 5 of Plaintiff's Complaint.

### REQUEST NO. 1

Please produce all documents identified in response to Plaintiff's first set of interrogatories to Defendants.

### REQUEST NO. 2

Please produce your file copy of the Lease Agreement between Plaintiff and Defendant Branch Banking and Trust Company dated February 7, 2003 and your file copy of the letter dated March 31, 2006 to Plaintiff and from Defendant Branch Banking and Trust Company.

### REQUEST NO. 3

Please produce all documents that you contend (a) are relevant to the relationship between Plaintiff and Defendant Branch Banking and Trust Company with respect to the Plaintiff's leasing of the storage room, (b) are relevant to your reason or reasons for removing the items from the storage room, and (c) support or tends to support your authorization for removing the items from the storage room and the subsequent disposal or destruction of those items.

This 15th day of December, 2010.

William C. Harris
State Bar No. 331667
John Burke Harris, III
State Bar No. 330510

Attorneys for Plaintiff,
Harris & James, LLP

Post Office Box 4866
Macon, Georgia 31208-4866
(478) 745-9661

# EXHIBIT 3

IN THE STATE COURT OF BIBB COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| HARRIS & JAMES, LLP, | : | |
|     Plaintiff | : | |
| | : | |
| v. | : | Civil Action No. |
| | : | |
| BRANCH BANKING AND TRUST | : | |
| COMPANY, CB RICHARD ELLIS, INC.: | | |
| AND CB RICHARD ELLIS REAL | : | |
| ESTATE SERVICES, LLC, | : | |
|     Defendants | : | |

## PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANTS BRANCH BANKING AND TRUST COMPANY, CB RICHARD ELLIS, INC. AND CB RICHARD ELLIS REAL ESTATE SERVICES, LLC

COMES NOW HARRIS & JAMES, LLP, Plaintiff, and requires that Defendants, **Branch Banking and Trust Company, CB Richard Ellis, Inc. and CB Richard Ellis Real Estate Services, LLC,** answer under oath the following interrogatories within forty-five (45) days from the date of service as provided by law, and a copy of the answers be furnished to Plaintiff's attorney, William C. Harris, Harris & James, LLP, 3573 Vineville Avenue, Post Office Box 4866, Macon, Georgia 31208-4866.

These interrogatories shall be deemed continuing so as to require supplemental answers if you or your attorneys obtain further information between the time answers are served and the time of trial. Any such supplementary answers are to be seasonably filed and served upon counsel for Plaintiff.

Any reference to **"You"** or **"Your"** is intended to mean Defendants **Branch Banking and Trust Company, CB Richard Ellis, Inc. and CB Richard Ellis Real Estate Services, LLC.**

As used in this document request, the term "document" or "documents" shall include any written or graphic matter including but not limited to, correspondence, memoranda,

EXHIBIT

3

notes, messages, letters, facsimile and e-mails, in whatever form, including but not limited to hard copy and digital form.

Any reference to **"storage room"** is the storage area leased by Harris & James, LLP pursuant to a written Lease Agreement dated February 7, 2003, and subsequent Letter Agreement dated March 31, 2006, and which is identified in Paragraph 5 of Plaintiff's Complaint.

## INTERROGATORY NO. 1

Please state the names, business addresses, telephone numbers, and relationship to you, if any, of all persons known to you or your attorneys who have knowledge of relevant information, facts or circumstances in this case; and as to each such person named, state the substance of their knowledge.

## INTERROGATORY NO. 2

Have you been properly served in this case and, if not, state each and every fact upon which you base your claim of improper service?

## INTERROGATORY NO. 3

Are you subject to the jurisdiction of this Court and, if not, state each and every fact upon which you base your claim of improper jurisdiction?

## INTERROGATORY NO. 4

If you contend that any of the Defendants had the right to remove the property from the storage room identified in Plaintiff's Complaint and/or to have that property disposed of or destroyed, please state each fact and identify each document that you contend supports or tends to support your contention.

## INTERROGATORY NO. 5

Please state the person or persons who authorized the removal and/or disposal or destruction of the property from the storage room identified in Plaintiff's Complaint, and as

to each such person please state by whom they were employed at the time the property was removed and/or disposed of or destroyed and their position and duties at their place of employment.

## INTERROGATORY NO. 6

Please state the date or dates that the property was removed from the storage room identified in Plaintiff's Complaint and state the date or dates the property was disposed of or destroyed, and the method of disposal or destruction.

## INTERROGATORY NO. 7

If you contend that Plaintiffs were notified prior to the removal and/or disposal of or destruction of the property that was being stored in the storage room identified in Plaintiff's complaint, please state the date of notification, the method of notification, and state each fact and identify each document, which you contend supports or tends to support your claim of notification.

## INTERROGATORY NO. 8

Please state each fact and identify each document which you contend supports or tends to support each affirmative defense that you raised in response or in answer to Plaintiff's Complaint.

## INTERROGATORY NO. 9

Please identify all documents that lists or catalogues or summarizes the items removed from the storage room identified in Plaintiff's Complaint, and as to each document please state the date it was created and the author of the document.

## INTERROGATORY NO. 10

If you contend Plaintiff was not current in its rental payments to Defendant Branch Banking and Trust Company and/or you contend that Plaintiff was in default under the terms of the Lease Agreement identified in Paragraph 5 of Plaintiff's Complaint prior to

the removal of the property from the storage room, please state each fact and identify each document that you contend supports or tends to support your contention.

## INTERROGATORY NO. 11

Please identify the name, current address, telephone number and employment capacity of the person or persons that physically removed the property from the storage room identified in Plaintiff's Complaint and the person or persons who subsequently disposed of or destroyed the property.

## INTERROGATORY NO. 12

Please state in detail the reason or reasons that the items in the storage room were removed and subsequently disposed of or destroyed.

This 15th day of December, 2010.

William C. Harris
State Bar No. 331667
John Burke Harris, III
State Bar No. 330510

Attorneys for Plaintiff,
Harris & James, LLP

Post Office Box 4866
Macon, Georgia 31208-4866
(478) 745-9661

# EXHIBIT 4

IN THE STATE COURT OF BIBB COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| HARRIS & JAMES, LLP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | |
| BRANCH BANKING AND | ) | FILE NO.: 77485 |
| TRUST COMPANY, CB | ) | |
| RICHARD ELLIS, INC. and CB | ) | |
| RICHARD ELLIS REAL ESTATE | ) | |
| SERVICES, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## NOTICE OF REMOVAL TO THE
## UNITED STATES DISTRICT COURT

Notice is hereby given that Defendants Branch Banking and Trust Company, CB Richard Ellis, Inc. and CB Richard Ellis Real Estate Services, LLC (collectively, "Defendants") have filed in the United States District for the Middle District of Georgia, Macon Division, their Notice of Removal of the above-styled action to the United States District Court in accordance with the provisions of 28 U.S.C. §§ 1441 and 1446. Attached hereto and incorporated by reference is a true and correct copy of said Notice of Removal and all exhibits thereto.

[SIGNATURE CONTAINED ON FOLLOWING PAGE]

EXHIBIT
4

Respectfully submitted, this 2nd of February , 2011.

RAY & SHERMAN, LLC

By: _____

James M. Sherman
Georgia Bar No. 644716
Attorney for Defendants
Branch Banking and Trust Company,
CB Richard Ellis, Inc., and
CB Richard Ellis Real Estate
Services, LLC

One Securities Centre
3490 Piedmont Road, Suite 700
Atlanta, Georgia 30305
Telephone:   (404) 892-3600
Facsimile:   (404) 892-0445

## CERTIFICATE OF SERVICE

This is to certify that I have this day served all parties in interest with the within and foregoing **NOTICE OF REMOVAL TO THE UNITED STATES DISTRICT COURT** by placing a copy of the same in the United States mail in a properly addressed envelope with adequate postage affixed thereon to:

>William C. Harris, Esq.
>John Burke Harris, Esq.
>Harris & James, LLP
>Post Office Box 4866
>Macon, Georgia 31208-4866

This _2nd_ day of _February_ , 2011.

>RAY & SHERMAN, LLC
>
>By: _____
>James M. Sherman
>Georgia Bar No. 644716
>Attorney for Defendants
>Branch Banking and Trust Company,
>CB Richard Ellis, Inc., and
>CB Richard Ellis Real Estate
>Services, LLC

One Securities Centre
3490 Piedmont Road, Suite 700
Atlanta, Georgia 30305
Telephone:  (404) 892-3600
Facsimile:  (404) 892-0445

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day electronically filed the within and foregoing **NOTICE OF REMOVAL OF CIVIL ACTION TO THE UNITED STATES DISTRICT COURT** with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to the following attorneys of record and that I have also served the following attorneys of record by placing a copy of the same in the United States mail in a properly addressed envelope with adequate postage affixed thereon to:

> William C. Harris, Esq.
> John Burke Harris, Esq.
> Harris & James, LLP
> Post Office Box 4866
> Macon, Georgia 31208-4866

This 2nd day of February, 2011.

Respectfully submitted,

s/ James M. Sherman, Esq.

_____

Georgia Bar No. 644716
Attorney for Defendants
Branch Banking & Trust Company,
CB Richard Ellis, Inc. and
CB Richard Ellis Real Estate
Services, LLC

RAY & SHERMAN, LLC
One Securities Centre
3490 Piedmont Road, Suite 700
Atlanta, Georgia 30305
Telephone:  (404) 892-3600
Facsimile:   (404) 892-0445
E-mail:  jsherman@rayandsherman.com

&JS 44 (Rev. 12/07)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
Harris & James, LLP

**DEFENDANTS**
Branch Banking and Trust Company, CB Richard Ellis, Inc. and CB Richard Ellis Real Estate Services, LLC

(b) County of Residence of First Listed Plaintiff   Bibb County, Georgia
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Forsyth County, NC
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
William C. Harris, Esq. and John Burke Harris, Esq., Harris & James, LLP, P.O. Box 4866, Macon, Georgia 31208-4866, Phone: (478) 745-9661

Attorneys (If Known)
James M. Sherman
Ray & Sherman, LLC, One Securities Centre, 3490 Piedmont Rd., Ste. 700, Atlanta, GA  30305, Phone: (404) 892-3600

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question (U.S. Government Not a Party)
- ☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **LABOR** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☒ 380 Other Personal Property Damage | | ☐ 710 Fair Labor Standards Act | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | | ☐ 720 Labor/Mgmt. Relations | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | | ☐ 740 Railway Labor Act | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 790 Other Labor Litigation | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus - Alien Detainee | | |
| | | | ☐ 465 Other Immigration Actions | | |

Note: SOCIAL SECURITY column: ☐ 861 HIA (1395ff), ☐ 862 Black Lung (923), ☐ 863 DIWC/DIWW (405(g)), ☐ 864 SSID Title XVI, ☐ 865 RSI (405(g))

**V. ORIGIN** (Place an "X" in One Box Only)

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. § 1441
Brief description of cause:
Personal property damage and breach of contract.

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ 250,000.00
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

**VIII. RELATED CASE(S) IF ANY**   (See instructions):
JUDGE _____  DOCKET NUMBER _____

DATE  2/2/2011
SIGNATURE OF ATTORNEY OF RECORD  _____

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____